[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1271 
The appellants, Daren Goodwin and Dewey Goodwin were convicted of robbery in the first degree, § 13A-8-41, Code of Alabama 1975; conspiracy to commit robbery in the first degree, § 13A-4-3; and hindering prosecution in the first degree, § 13A-10-43. They were sentenced to 30 years' imprisonment on the robbery conviction, 10 years' imprisonment on the conspiracy conviction and 10 years' imprisonment on conviction for hindering prosecution, with the sentences to run concurrently.[1] They were also ordered to pay restitution in the amount of $3359.56. They appeal their convictions, raising several issues.
The state's evidence tends to show the following. Dewey, Daren and William Sellers went to David King's house in Atlanta to speak to King about selling a stolen car in Alabama. King agreed to join them the next day and asked if his cousin Xavier Murray could go with them. The next day, Dewey, Daren, and Sellers picked King and Murray up in Atlanta. King and Murray, both from Atlanta, were asked to join in the plan because Deroy Butler, the target of their scheme, did not know them. Butler knew Daren and Dewey. The group planned to sell or pawn the stolen car to Butler and then take it back. They decided that Murray and King would approach Butler because in addition to not being known by Butler, they were juveniles.
After arriving in Alabama, the group went to Butler's store, which was closed. Sellers left the group at this time. The rest of the group went to the house of Patrick Goodwin. The five agreed that King and Murray would attempt to sell or to pawn the stolen car to Butler. Any money obtained was to be split six ways. They also agreed that, if Butler refused to buy or pawn the car, King and Murray were to tie Butler up, cut the telephone lines at his house, and take his money. Dewey and Daren gave King and Murray guns to take with them and showed them how to use them. Daren loaded and gave Murray a .32 caliber pistol. Dewey gave King a .22 caliber pistol and explained that the gun was not working properly because it would take only one round at a time. Patrick, Dewey, and Daren left King and Murray near Butler's house and waited nearby in their vehicle.
King and Murray walked to Butler's house and discovered that he was not at home. They were about to leave when Butler drove up in his truck. They spoke to Butler about the possibility of pawning a car. When Butler asked them where the car was, they told him that the car had ran out of gas and was parked nearby. Butler told them that they had the wrong man and asked them to leave. Butler then entered his house. At this point, King's testimony and Murray's testimony differ. King testified that, after Butler told them that they had the wrong man they walked back to the waiting car and got the guns. Murray testified that they never left Butler's property, but had the guns in their possession from the beginning.
When Butler entered his house, he telephoned the sheriffs department and reported that something suspicious was going on at his residence. He was told that the only car the department had out that day was not nearby, but that someone would come to his house soon. Butler then called a neighbor and asked her to come over because he said *Page 1272 
he was worried about the two men in his yard. King and Murray were still waiting outside the house when the neighbor and her son-in-law arrived. The neighbors went into the house to check on Butler. King and Murray testified that Butler had a gun (possibly a 12-gauge shotgun) well within view of the front door and that they felt threatened by it. Butler himself testified that he had a shotgun and that it is possible that King and Murray saw him pick up the shotgun and place it behind the door.
At this point, either King or Murray started to walk back behind the house. Butler yelled for him to come back, saying that the sheriff was on his way. Both men returned to the front of the house. At the time, Butler's neighbor was talking on the telephone with someone in the sheriffs department. Butler was then staring at a gun pointed at him through the storm door. King shot Butler three times and ran. Murray turned and ran when King fired the shots. King testified that he had seen Butler pick up his gun and that he shot Butler so he could escape. Butler denied ever having pointed a gun at anyone. Butler was hospitalized two days as a result of the bullet wounds, and the bullets were not removed from his body.
After Butler was shot, King and Murray ran down the road to find Dewey, Daren, and Patrick driving away. They hid in a cemetery while trying to decide what to do. The police later found the .22 caliber pistol in the cemetery and discovered that it was in fact defective in that it would take only one round at a time. They also found a mask and a cassette tape that were later determined to have had been left by King and Murray. King and Murray spent the night in a "hay stable." The next day they stopped at a house and asked the resident which direction they should walk to get back on the highway to Atlanta. When they reached the highway, they began walking in the direction that they thought was taking them to Atlanta. A motorist who knew King stopped on the highway, told them they were walking in the wrong direction, and gave them a ride. They eventually went to Patrick's house where they found Dewey, Daren, and Patrick. Dewey and Daren asked them if they had gotten any money. Murray and King wanted to return to Atlanta. Because the police would be looking for them and they thought roadblocks might have been set up, Murray and King suggested that they should ride in the trunk of the car. Daren and Dewey drove them to Atlanta. They rode in the trunk, but after crossing the Georgia state line, they rode in the back seat. Patrick stayed in Alabama.
Shortly thereafter, King and Murray were arrested in Atlanta for their involvement in the shooting. While King and Murray were in jail, Dewey, who was also in jail at the time, attempted to have a letter delivered to them. Jail personnel intercepted the letter and it was entered into evidence at trial. The letter basically instructed King and Murray as to what they should say to the police. Dewey suggested in the letter that, if they would follow his instructions, they would all stay out of trouble. He asked the juveniles to tell the police that they had been in their own car on the day of the shooting and that they shot Butler in self-defense. Dewey also promised to get them a good attorney if he was released. Dewey requested that they burn the letter after they finished reading it.
Dewey and Daren admitted at trial that they let King and Murray out of their automobile about one-half mile from Butler's house, but they claimed that they did not know what King and Murray were going to do. They also admitted knowing that the guns were in their car but they denied giving them to King and Murray. Dewey and Daren testified that they drove King and Murray to Atlanta, and that King and Murray rode part of the way in the trunk of their car.
 I. A.
Dewey and Daren contend that the state failed to present sufficient evidence to support their convictions for hindering prosecution. We agree. Dewey and Daren were convicted on an indictment charging that they "did, render criminal assistance to . . . King . . . and . . . Murray . . . by intentionally hindering the apprehension, prosecution, *Page 1273 
conviction or punishment of . . . King and . . . Murray . . . for conduct constituting. . . attempted Murder, in that [they] did, harbor or conceal [King and Murray] in violation of §13A-10-43 of the Code of Alabama." The prosecution's evidence shows that Dewey and Daren hid King and Murray in the trunk of their automobile on the trip back to Atlanta in order to avoid apprehension.
Section 13A-10-43(a) defines hindering prosecution in the first degree as follows:
 "A person commits the crime of hindering prosecution in the first degree if with the intent to hinder the apprehension, prosecution, conviction or punishment of another for conduct constituting a murder or a Class A or B felony, he renders criminal assistance to such person."
Section 13A-10-42(1) and (3) provides that "a person renders 'criminal assistance' to another if he . . . [h]arbors or conceals such person [or] [p]rovides such person with money, transportation, weapon, disguise or other means of avoiding discovery or apprehension." This statutory language was construed in Washington v. State, 562 So.2d 281
(Ala.Cr.App. 1990), where the court was confronted with the question of whether the defendant could plead guilty to the offense of hindering prosecution in the first degree as a lesser included offense of first degree robbery charged in the indictment. In holding, in essence, that as a matter of law, the offense of hindering prosecution is not a lesser included offense of the offense upon which the underlying prosecution could be based (specifically, in Washington robbery) the court stated:
 " 'The charge of hindering prosecution is inapplicable to a person charged as a principal. . . .'
 "People v. Mercedes, 121 Misc.2d 419, 467 N.Y.S.2d 973, 974 (1983). . . .
". . . .
 "Neither the statutory definition of hindering prosecution in the first degree, § 13A-10-43, nor the statutory definition of criminal assistance, § 13A-10-42, 'states that a person may render criminal assistance to himself. If the legislature had so intended, it could have inserted that provision in the statute. Instead the legislature used the words "person" or "such person" throughout those sections and did not refer to the underlying principal.' Mercedes, 467 N.Y.S.2d at 974.
 " 'Moreover, if a defendant could be convicted of hindering his own prosecution, almost any defendant could be accused of rendering criminal assistance to himself. Thus a principal could be accused of harboring himself, warning himself or doing any of the other acts proscribed by section [13A-10-43]. This is not a valid interpretation of the statute.'
 "Mercedes, 467 N.Y.S.2d at 975. See also Vickers v. State, 547 So.2d 1194
(Ala.Cr.App. 1989) (Refusing to aid a police officer is not a lesser included offense of escape. 'This section is intended to apply, not to perpetrators of the offense. . . .').
 "The history of the offense of hindering prosecution in Alabama shows that the offense has been limited to persons other than principals.
 " 'Under Alabama law the conduct described under § 13A -10-42 and prohibited by §§ 13A-10-43 and 13A-10-44 would ordinarily make one an "accessory after the fact." Former §§ 13-9-1 and 13-9-2. Former § 13-9-1 provided that all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense or aid or abet in its commission, will be tried and punished as principals. Parsons v. State, 33 Ala. App. 309, 33 So.2d 164
(1948), established that participation in the crime may be proven by circumstantial evidence. Former § 13-9-2 dealt with accessories after the fact and provided any person, other than parent, child, brother, sister, husband or wife of the offender, who gives aid to the offender with the intent to enable him to avoid or escape from arrest, trial, conviction, or punishment in connection with a felony may be imprisoned in county jail up to six months and/or fined up to $1,000.00.'
 "Commentary to H 13-A-44 through 13A-10-42
(emphasis added [in Washington]). 'Although Section 13-9-1 has been repealed, there is — for purposes of indictment *Page 1274 
and trial — still no distinction between principals and accessories under Alabama law.' Lewis v. State, 469 So.2d 1291, 1297
(Ala.Cr.App. 1984), aff'd, 469 So.2d 1301
(Ala. 1985)."
562 So.2d at 282-83.
In applying the above rationale to the instant facts, we conclude that the indictments of Dewey and Daren for the offense of hindering prosecution in the first degree was improper. While it is true that the indictment charged them with hindering the prosecution of King and Murray for the underlying offense of attempted murder, the attempted murder charge arose out of the same facts supporting the prosecution of Dewey and Daren for first degree robbery and for conspiracy to commit first degree robbery. To convict them of hindering the prosecution of King and Murray under these circumstances would, in essence, be convicting them of hindering their own prosecution, which is prohibited by Washington. Thus, this conviction must be reversed and the case remanded.
 B.
Dewey and Daren contend that the state failed to present sufficient evidence to sustain their convictions for robbery in the first degree. We disagree. In order for the state to prove robbery in the first degree, it must prove that the defendants "in the course of committing a theft," § 13A-8-43, were armed with a deadly weapon or a dangerous instrument, which was used "with intent to overcome [the victim's] physical resistance or physical power of resistance," § 13A-8-41. Dewey and Daren clearly intended for King and Murray to rob Butler if they did not succeed in pawning the car with him. They gave King and Murray guns and instructed them on how to use the guns so as to overcome Butler's physical resistance and take his money. Construing the evidence, as we must, most favorably to the prosecution, we conclude that the jury could have reasonably concluded from the evidence that the shooting of Butler was done with the intent to overcome his resistance and that only after shooting Butler did King and Murray abandon the intent to take his money. This evidence is sufficient to sustain Dewey's and Daren's convictions for robbery in the first degree.
 C.
Dewey and Daren contend that the state failed to present sufficient evidence to support their convictions for conspiracy to commit robbery in the first degree. In order to prove the existence of a conspiracy, the state must prove that "with intent that conduct constituting an offense be performed, [the defendant] agrees with one or more persons to engage in or cause the performance of such conduct, and any one or more of such persons does an overt act to effect an objective of the agreement," § 13A-4-3 (emphasis added). We find that sufficient evidence was presented to support the existence of an agreement between Dewey, Daren, and the others to rob Butler. Clearly, there are many acts supplying the "overt act" necessary to support a conspiracy conviction, one of which was the shooting of Butler with one of two weapons provided by Dewey and Daren as charged in the indictment.
 II.
Dewey and Daren contend that the trial court committed reversible error by denying their motions for judgments of acquittal based on allegedly insufficient corroboration of accomplice testimony. They argue that their convictions were based upon the testimony of Murray and King, which, they argue, was not corroborated. Clearly, Murray and King were accomplices, and their testimony was the centerpiece of the state's case against Dewey and Daren.
Section 12-21-222, Code of Alabama 1975, provides:
 "A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroboration evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."
The test for determining the sufficiency of evidence corroborating the testimony of an *Page 1275 
accomplice is based on a subtraction process. The accomplice testimony must be eliminated, and then if, upon examination of all other evidence, there is sufficient evidence tending to connect the defendant with the commission of the offense, there is sufficient corroboration. Miller v. State, 290 Ala. 248, 275 So.2d 675 (1973): Steele v. State,512 So.2d 142 (Ala.Cr.App. 1987). Corroborative evidence need not be strong, and need not be sufficient in and of itself to support a conviction; it need not directly connect the accused with the crime, but only tend to do so. Andrews v. State,370 So.2d 320 (Ala.Cr.App.), cert. denied, 370 So.2d 323
(Ala. 1979). Circumstantial evidence is sufficient to show such corroboration. Hodges v. State, 500 So.2d 1273
(Ala.Cr.App. 1986).
Proof that the accused was in the company of an accomplice near the time and place of the crime is not always sufficient corroboration for the purposes of § 12-21-222; however, if, near the time of the commission of the offense, the accused and the accomplice were together, near where the crime was committed, this may, in conjunction with other facts and circumstances, however slight, sufficiently tend to connect the accused with the commission of the crime to furnish the necessary corroboration. Kimmons v. State,343 So.2d 542 (Ala.Cr.App. 1977). Dewey and Daren testified that they drove King and Murray to Butler's house and that they let them out of the car a short distance from and out of sight of the house. This obviously occurred shortly before the offenses were committed. This testimony places both defendants in the company of the testifying accomplices in proximity to the time and place of the crimes.
We next look for additional facts and circumstances, to further support the evidence of time and geographic proximity and association. Evidence of flight of the accused is sufficient to meet this requirement. Id. at 547. Dewey and Daren testified that they transported Murray and King back into Georgia in the trunk of their car. It can reasonably be inferred from this testimony that Dewey and Daren were fleeing from the scene of the crimes and were transporting the accomplices in the trunk of their car to avoid detection. Their flight from the scene tends to connect Dewey and Daren with the commission of the crimes and thus corroborates the testimony of Murray and King. In addition, the letter that Dewey tried to send to Murray and King, urging them to make false statements so that he and Daren could escape prosecution, also tends to connect Dewey and Daren to the crime and thus corroborates the accomplices' testimony. We find that there was sufficient corroboration to meet the requirements of § 12-21-222, and that the trial court's denial of the motions for judgments of acquittal on that ground were proper.
 III.
Dewey and Daren contend that their convictions should be reversed because, they argue those convictions were against the weight of the evidence. We find that this issue has no merit. See Johnson v. State, 555 So.2d 818, 820
(Ala.Cr.App. 1989).
 IV.
Dewey and Daren contend that § 13A-4-5, Code of Alabama 1975, prohibits their convictions both for conspiracy to commit robbery in the first degree and for robbery in the first degree. Section 13A-4-5(b)(3) states, "A person may not be convicted on the basis of the same course of conduct of both the actual commission of an offense and . . . [c]riminal conspiracy of the offense." The commentary to subsection (b) states, "Sub-section (b) merges the inchoate crime into the conviction for the substantive crime to the extent that it bars a double conviction for both the substantive crime and . . . a conspiracy to commit the crime."
The state contends that this issue was not preserved for our review. We agree.
 " 'While this contention appears to have considerable merit, it was never raised below and is therefore waived on appeal. Bolden v. State, 568 So.2d 841, 844 (Ala.Cr.App. 1989). 'The proper method to raise the issue of former jeopardy [is] by special plea and, in the absence of such a plea, the issue is not properly before the Court of Criminal Appeals.' Hill v. State, 410 So.2d 431, 434 (Ala.Cr.App. 1981) '[T]he defense *Page 1276 
of double jeopardy . . . should be raised by a motion under [Rule 15.2, A.R.Crim.P.].'
Berry v. State, 597 So.2d 730, 732 (Ala.Cr.App. 1992).
 V.
Dewey and Daren contend that the trial court should have balanced their Sixth Amendment right to compulsory process with Patrick's Fifth Amendment right against self-incrimination. Patrick was called to testify for the defense, but invoked his Fifth Amendment right against self-incrimination. Dewey and Daren contend that the trial court erred by not requiring Patrick to testify. They further contend that the trial court should have allowed a limited examination of Patrick in an effort to balance these rights. We have found no Alabama case law requiring that the trial court attempt to balance these rights by permitting a limited examination of the witness who has invoked the right against self-incrimination. It is clear, however, that a witness's Fifth Amendment right against self-incrimination outweighs the defendants' Sixth Amendment right to compulsory process. See United States v.Hernandez, 962 F.2d 1152, 1161 (5th cir. 1992); Pughv. State, 376 So.2d 1135 (Ala.Cr.App. 1979). The trial court did not err by denying Dewey's and Daren's request for a limited inquiry into Patrick's refusal to testify nor did it err in not requiring him to testify.
 VI.
Dewey contends that the trial court erred in allowing Murray and King to testify before evidence of a conspiracy was presented. We disagree. "[A]lthough proof of the conspiracy should be made before admittance against the accused of the co-conspirator's act or statement, subsequent proof of the conspiracy cures any error in prematurely admitting the act or statement." Lundy v. State, 539 So.2d 324, 330
(Ala.Cr.App. 1988) (quoting C. Gamble, McElroy's AlabamaEvidence, § 195.03(2) (3d ed. 1977). We have already held that the state presented sufficient evidence from which the jury could have found Dewey and Daren guilty of conspiracy. Although evidence of the conspiracy was presented after the testimony of Murray and King, any error that may have occurred in allowing the co-conspirators to testify before the evidence of a conspiracy was presented was cured when the evidence of the conspiracy was subsequently admitted.
 VII.
Dewey contends that the trial court erred by failing to charge the jury on the offense of attempted theft. This issue, however, has not been preserved for our review. Dewey failed to enter a specific objection to the trial court's failure to charge the jury on attempted theft.
 "It is the appellant's burden to '. . . advise the trial judge of his objections to the jury charge, stating his grounds, before the jury retires.' Cox v. State, 500 So.2d 1296, 1299
(Ala.Cr.App. 1986). 'The objection must be specific enough to point out the alleged error so as to allow the judge to correct the error.' Biddie v. State, 516 So.2d 846 (Ala. 1987). The objection 'we except' is not sufficient to put the trial court on notice of the claimed error. See Johnson v. State, 552 So.2d 883
(Ala.Cr.App. 1989)."
Hagood v. State, 588 So.2d 526, 533 (Ala.Cr.App. 1991).
 VIII.
Dewey contends that the trial court erred by admitting into evidence the letter he allegedly wrote to King and Murray. First, Dewey contends that the state failed to make the letter available to him before the trial. This argument, however, is without merit. The prosecution did make the letter available to Dewey before trial. If Dewey had searched through the physical evidence that had been made available to him, he would have known of the existence of this letter.
Second, Dewey claims that the evidence failed to establish a chain of custody of the letter. The evidence shows that the letter was delivered by Dewey to Chris Heard, a prison trusty. Before Heard could deliver the letter to King and Murray, Ralph Owens, a jailer, intercepted it. Owens then placed it in a basket designated for materials intended to "go across the street" and into the hands *Page 1277 
of Investigator James Bailey. Bailey testified that when he received the letter, it was still sealed and did not appear to have been tampered with. Dewey testified in his own behalf at trial and had an opportunity to challenge the authenticity of this letter, but never did so. Because the authenticity of the letter was never questioned, we hold that the trial court did not err in admitting the letter into evidence.
For the reasons stated above, Dewey's and Daren's convictions for hindering prosecution are reversed and the cases as they relate to that charge are remanded. Dewey's and Daren's convictions for robbery in the first degree and for conspiracy to commit robbery in the first degree are hereby affirmed.
REVERSED AND REMANDED IN PART; AFFIRMED IN PART.
All Judges concur.
[1] Co-conspirators David King and Xavier Murray pleaded guilty and were sentenced to 30 years' imprisonment for attempted murder; 10 years' imprisonment for shooting into an occupied building; and 10 years' imprisonment for conspiracy to commit robbery in the first degree. The sentences were to run concurrently. These co-conspirators testified against Dewey and Daren. Another co-conspirator, Patrick Goodwin, had not been tried at the time of the trial of this case. William Sellers, another co-conspirator, was charged with hindering prosecution and had not been tried at the time of the trial of this case.